## *PRELIMINARY PRINT*

## VOLUME 604 U. S. PART 2

### PAGES 712–760

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

APRIL 22, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# MONSALVO VELÁZQUEZ *v.* BONDI, ATTORNEY GENERAL

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 23–929.   Argued November 12, 2024—Decided April 22, 2025

The federal government initiated removal proceedings against petitioner Monsalvo Velázquez, who asked the government to suspend its removal efforts or, alternatively, to permit him to leave the United States voluntarily.   The immigration judge concluded Monsalvo was removable but granted him an opportunity to voluntarily depart within 60 days. After the Board of Immigration Appeals rejected his appeal, it granted Monsalvo a new 60-day voluntary departure period.   The 60th day fell on Saturday, December 11, 2021.   Monsalvo filed a motion to reopen proceedings on Monday, December 13.   The Board rejected that motion, concluding that the voluntary departure period had expired on Saturday, and Monsalvo's motion was therefore too late.   Monsalvo asked the Board to reconsider that conclusion, but the Board refused.   Monsalvo then petitioned for judicial review in the Tenth Circuit.   The Tenth Circuit agreed with the Board, holding that the voluntary departure deadline in 8 U. S. C. § 1229c(b)(2) refers to calendar days with no extension for deadlines that fall on weekends or holidays.

*Held*:

1. This Court has jurisdiction to review Monsalvo's petition.   Under § 1252, courts may review "final order[s] of removal" and "all questions of law" arising from them.   Monsalvo's petition sought judicial review of a legal question about the meaning of a term in his final removal order—specifically, the meaning of "60 days" for voluntary departure. Although Monsalvo did not challenge his removability, nothing in § 1252 requires an individual to press a challenge to one term in a final order of removal just to secure judicial review of another.   This Court rejects the government's argument that a petition must include a challenge to removability to secure judicial review.   Such an interpretation would force litigants to assert meritless claims simply to obtain jurisdiction. Pp. 719–724.

2. Under § 1229c(b)(2), a voluntary-departure deadline that falls on a weekend or legal holiday extends to the next business day.   The Board and the Tenth Circuit understood "days" to bear the ordinary meaning of calendar days, no more or less.   But evidence suggests a specialized meaning in legal settings where the term "days" is often understood to

extend deadlines falling on a weekend or legal holiday to the next business day. When Congress adopts a new law against the backdrop of a "longstanding administrative construction," the Court generally presumes the new provision works in harmony with what came before. *Haig* v. *Agee*, 453 U. S. 280, 297–298. Since at least the 1950s, immigration regulations have provided that when calculating deadlines, the term "day" carries its specialized meaning by excluding Sundays and legal holidays (and later Saturdays) if a deadline would otherwise fall on one of those days. Congress enacted §1229c(b)(2) as part of §304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) against this consistent regulatory backdrop. The government concedes that other deadlines in the same section of IIRIRA, such as deadlines for motions to reopen or reconsider, are subject to this rule. The identical term "days" should be given the same meaning throughout §304, especially when the provisions were enacted at the same time in the same section of the law.

Three principal counterarguments are insufficient to overcome the presumption that §1229c(b)(2) follows the government's own longstanding practice of extending deadlines falling on a weekend or legal holiday to the next business day. First, the fact that the regulatory definition of "day" applies directly only to regulatory deadlines and not to statutory deadlines like the one found in §1229c(b)(2) is irrelevant. The question here is not whether a regulation can trump a statute but whether Congress's work in §304 of IIRIRA should be read in light of the government's longstanding regulatory practice. Second, the argument that Congress intended different treatment for voluntary departure because it selected 60 days rather than adopting a pre-existing regulatory deadline of 90 or 30 days is unpersuasive, as nothing in §304 hints that deadlines should operate differently, and the government itself did not advance this view when promulgating rules to enforce the deadline. Third, nothing in the text supports the government's proposed distinction between "procedural" and "substantive" deadlines, as §304 does not draw such lines, nor does the regulatory background suggest this distinction. Pp. 724–731.

88 F. 4th 1301, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and JACKSON, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, and in which KAVANAUGH and BARRETT, JJ., joined as to Parts I and II, *post*, p. 731. ALITO, J., *post*, p. 748, and BARRETT, J., *post*, p. 758, filed dissenting opinions, in which KAVANAUGH, J., joined.

*Gerard J. Cedrone* argued the cause for petitioner. With him on the briefs were *David J. Zimmer* and *Sierra J. Perez-Sparks*.

*Anthony A. Yang* argued the cause for respondent. With him on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Gannon, John W. Blakeley, Melissa Neiman-Kelting*, and *Andrew C. MacLachlan.**

JUSTICE GORSUCH delivered the opinion of the Court.

This case poses a question about how to calculate a deadline. Often, the government may detain and deport an individual after properly determining he is unlawfully present in this country. But, under 8 U. S. C. § 1229c(b), the government will sometimes delay detention and deportation for up to "60 days" to allow those of "good moral character" to leave the country on their own terms. When it comes to many other deadlines in immigration law, if the final day permitted for taking an action falls on a weekend or legal holiday, the deadline rolls over to the next business day. The question for us is whether § 1229c(b)(2)'s 60-day voluntary-departure deadline works that same way.

I

A

Born in Mexico, Hugo Monsalvo Velázquez entered the United States unlawfully as a teenager about 20 years ago. Since then, he has made his life in Colorado. Pet. for Cert. 15. There, he attended high school, some college, and met and married his wife. *Ibid.* The couple has an 11-year-old son and a 9-year-old daughter, both U. S. citizens. *Ibid.*

--------

*Briefs of *amici curiae* urging reversal were filed for the American Immigration Lawyers Association by *Amanda K. Rice*; for the Round Table of Former Immigration Judges by *Scott H. Angstreich*; and for Thomas Fuller Ogden, *pro se.*

Mr. Monsalvo and his wife have raised their family in a home they own outside Denver, where he also owns and operates a small business. *Ibid.*

In 2011, the federal government initiated proceedings to remove Mr. Monsalvo from the country. *Velazquez* v. *Garland*, 88 F. 4th 1301, 1303 (CA10 2023). In response, Mr. Monsalvo did not dispute that he had entered the country unlawfully, but he asked the government to suspend its removal efforts because he would face persecution if returned to Mexico. App. to Pet. for Cert. 44a–50a. Alternatively, he sought permission to leave the country voluntarily. *Id.*, at 50a.

That second request was important to him. As a rule, individuals lawfully determined to be deportable from this country are not entitled to leave on their own terms but instead face detention and forcible removal. See *Dada* v. *Mukasey*, 554 U. S. 1, 11 (2008). In certain circumstances, however, the government can afford the option of a "voluntary departure" to those "of good moral character." §1229c(b)(1)(B). When the government extends this option, it effectively makes detention and removal contingent: Officials may detain and remove the individual only if he remains in the country after his voluntary-departure period has expired. Suspending removal in this way can benefit both the government and the individual. For the government, an individual's voluntary departure saves the cost and effort associated with detention and removal. *Id.*, at 11. For the individual, it not only allows him to choose how and when he leaves the country. It also allows him to avoid substantial penalties associated with a forcible removal. *Id.*, at 11–12 (citing §1182(a)(9)(A)).

In 2019, an immigration judge issued a decision in Mr. Monsalvo's case. The judge rejected his claim that he would face persecution if returned to Mexico. But the judge also found Mr. Monsalvo eligible for voluntary departure and gave him 60 days to leave the country, the maximum allowed

by law. App. to Pet. for Cert. 51a. As it happened, the
end of that 60-day period fell on a Saturday. So, the judge
specified, Mr. Monsalvo's deadline for departing voluntarily
would extend to the following Monday. *Id.*, at 70a. Should
he fail to leave within that period, the immigration judge
further ordered, Mr. Monsalvo would face removal and the
penalties associated with it. *Id.*, at 51a.

Mr. Monsalvo responded by appealing to the Board of Im-
migration Appeals. By regulation, that appeal stayed the
immigration judge's order. See 8 CFR § 1003.6 (2019);
*Dada*, 554 U. S., at 10. On October 12, 2021, the Board is-
sued its own decision. In it, the Board rejected Mr. Monsal-
vo's argument that he would face persecution in Mexico and
gave him a (new) period of "60 days to voluntarily depart"
the United States, "the maximum period allowed by"
§ 1229c(b)(2). App. to Pet. for Cert. 40a. If he "fail[ed] to
voluntarily depart" within that period, the Board added, he
"shall be removed." *Id.*, at 42a. Summing up, the Board
explained its disposition this way:

> "ORDER: The respondent's appeal is dismissed.
> "FURTHER ORDER: . . . the respondent(s) is (are)
> permitted to voluntarily depart . . . within 60 days . . . .
> In the event a respondent fails to voluntarily depart . . .
> the respondent shall be removed as provided in the Im-
> migration Judge's order." *Ibid.*

The Board's decision also included two other salient provi-
sions. In one, the Board warned Mr. Monsalvo that he
would face serious penalties if he overstayed his voluntary-
departure deadline. Those penalties could include not just
removal and monetary fines, but also ineligibility for most
forms of immigration relief for a period of 10 years. *Id.*, at
42a–43a; 8 U. S. C. § 1229c(d)(1). In the other provision, the
Board advised Mr. Monsalvo of his right to file a motion to
reopen his removal proceedings if he thought he had new and
previously unavailable evidence that could alter the Board's

assessment of his case. App. to Pet. for Cert. 43a. If he filed such a motion *before* the expiration of his 60-day voluntary-departure period, the Board continued, the penalties associated with failing to depart would "not apply." *Ibid.*; 8 CFR § 1240.26(b)(3)(iii) (2021).

B

Consistent with the Board's direction, Mr. Monsalvo filed a motion to reopen. On Friday, December 10, 2021, his attorney served the government with a copy and sent the original to the Board using an overnight delivery service. Brief for Petitioner 12. On the following Monday, December 13, 2021, the Board accepted the motion for filing. *Ibid.* The motion drew the Board's attention to this Court's then-recent decision in *Niz-Chavez* v. *Garland*, 593 U. S. 155 (2021), and argued that, under its terms, Mr. Monsalvo was entitled to have his order of removal canceled. Brief for Petitioner 12. The Board denied the motion to reopen for two reasons. First, it held that *Niz-Chavez* did not justify reopening Mr. Monsalvo's removal proceedings. App. to Pet. for Cert. 37a. Second, and without prompting from the government, the Board held that his motion to reopen had arrived too late. *Id.*, at 38a.

The Board's second holding rested on an interpretation of § 1229c(b)(2)'s voluntary-departure deadline. The Board began by observing that it had given Mr. Monsalvo "60 days" to depart voluntarily, the maximum allowed by § 1229c(b)(2). Interpreting that statute, the Board read its use of the term "days" to refer to calendar days. Here, that meant Mr. Monsalvo's voluntary-departure period began on October 12, 2021, when the Board issued its removal order, and expired on Saturday, December 11, 2021. The Board did not question that Mr. Monsalvo *served* his motion to reopen the day before, on Friday, December 10, 2021. But, the Board stressed, the motion was not *filed* until the following business day, Monday, December 13, 2021. And, as the Board

saw it, that created a problem. Because Mr. Monsalvo had neither left the country nor filed a motion to reopen before the expiration of his voluntary-departure period, the Board said, the penalties it had previously warned Mr. Monsalvo about now applied. See *supra*, at 716. Accordingly, the Board held, it was powerless to entertain his motion—or nearly any request for immigration relief he might wish to pursue for the next decade. App. to Pet. for Cert. 38a (citing § 1229c(d)); see also *id.*, at 43a.

Mr. Monsalvo filed a motion asking the Board to reconsider this second holding. Pet. for Cert. 19. His reason for focusing on it was obvious. Not only did that holding prevent him from seeking to reopen his case; the Board's reasoning had the potential to foreclose for years almost any avenue of lawful immigration relief he might hope to pursue. Addressing the Board's holding, Mr. Monsalvo argued that it misconstrued § 1229c(b)(2). As a matter of law, he submitted, that statute operates to extend any deadline that falls on a weekend or legal holiday to the next business day. The immigration judge handling his case had understood § 1229c(b)(2) to work just this way. See *supra*, at 716; App. to Pet. for Cert. 70a. And under that view of the law, Mr. Monsalvo contended, his voluntary-departure deadline did not expire until Monday, December 13, 2021. As a result, his motion to reopen was timely filed that same day, and the penalties associated with failing to file a motion to reopen or to depart voluntarily did not apply. See 88 F. 4th, at 1305. Ultimately, however, the Board disagreed, stood by its earlier decision, and denied Mr. Monsalvo's motion for reconsideration. *Ibid.*

C

Having failed before the agency, Mr. Monsalvo turned to court, petitioning the Tenth Circuit to review the Board's order denying his motion for reconsideration. § 1252(a)(1). But that effort failed too. Like the Board, the Tenth Circuit thought that the provision in his final order of removal grant-

ing him "60 days" to depart voluntarily was "[c]onclusively
. . . governed by" §1229c(b)(2). *Id.*, at 1308. And, like the
Board, the court read the statute as speaking in terms of
"calendar days." *Id.*, at 1303. From this, the court rea-
soned, it followed that Mr. Monsalvo's voluntary-departure
deadline expired on Saturday, December 11, 2021, and his
failure to file a motion to reopen or to depart voluntarily by
that date made it impossible for the Board to entertain either
his motion or perhaps any other application from him for
years. *Id.*, at 1309–1310.

We agreed to take up the case because the Tenth Circuit's
interpretation of §1229c(b)(2) opened a circuit split. 603
U. S. 903 (2024). While the Tenth Circuit has construed the
statute to afford an individual no more than 60 calendar days
to leave the country voluntarily, the Ninth Circuit has read
it to extend a deadline falling on a weekend or legal holiday
to the next business day. See *Meza-Vallejos* v. *Holder*, 669
F. 3d 920 (2012). Who is right on this question of statutory
interpretation matters greatly to people like Mr. Monsalvo.
Not only does it affect the time one may have to reopen im-
migration proceedings. As we have seen, it also affects an
individual's exposure to detention, removal, and fines, and
carries with it serious ramifications for his ability to seek
lawful status for years into the future. §§1229c(d)(1),
1182(a)(9); 8 CFR §1240.26(a).

II

Before we can address that question, however, we must
attend to an antecedent one. In the Tenth Circuit, the gov-
ernment argued that court lacked statutory jurisdiction to
entertain Mr. Monsalvo's petition. Here, the government
renews its claim. On its view, we cannot pass on who has
the better reading of §1229c(b)(2), but must instead vacate
the Tenth Circuit's judgment and remand Mr. Monsalvo's pe-
tition to that court with instructions to dismiss it. See Brief
for Respondent 15–20.

A

The Tenth Circuit's jurisdiction hinged on § 1252(a)(1).
That provision allows an individual to petition for "[j]udicial
review of a final order of removal" in the appropriate court
of appeals. *Ibid.* Such a petition supplies the exclusive
means for obtaining "[j]udicial review of all questions of law
and fact . . . arising from any action taken or proceed-
ing brought to remove an alien from the United States."
§ 1252(b)(9).

The Tenth Circuit held that it had statutory jurisdiction to
consider Mr. Monsalvo's petition, and we agree. On October
12, 2021, the Board issued an order which petitioner con-
tends, and the government does not dispute, constituted a
final order of removal. See App. to Pet. for Cert. 42a–43a;
Reply Brief 5; Tr. of Oral Arg. 37–38, 64–65. That order
conditionally authorized Mr. Monsalvo's detention and
removal, providing that "[i]n the event" he failed to leave
voluntarily "within 60 days," the "maximum period allowed
by" § 1229c(b)(2), authorities could detain and "remov[e]"
him. App. to Pet. for Cert. 40a, 42a; *supra*, at 716. In later
administrative proceedings, the parties disagreed about
what that order meant. The government read § 1229c(b)(2),
and thus the order, as affording Mr. Monsalvo 60 calendar
days before authorities could detain and remove him—
and thus before his time to file a motion to reopen effectively
expired. Mr. Monsalvo interpreted the statute, and thus
his order, to extend his 60-day deadline, which fell on a week-
end, to the next business day. Mr. Monsalvo's petition to
the Tenth Circuit asked that court to resolve the parties'
dispute. Or, to put it in § 1252's terms, he asked the court
to review his "final order of removal" and address a "ques-
tio[n] of law . . . arising from" its terms. Exactly as the
law allows.

It is true that Mr. Monsalvo did not seek judicial review
immediately after the Board entered its final order of re-
moval. But, at that stage, he had no reason to do so. The

Board had given him "60 days" to leave the country, and the immigration judge had already explained to him that a voluntary-departure deadline falling on a weekend rolls over to the next business day. *Supra*, at 715–716. The dispute over the meaning of "60 days" arose only later, when, in ruling on his motion to reopen and without prompting from the government, the Board held that his voluntary-departure deadline expired on a Saturday. See *supra*, at 717; App. to Pet. for Cert. 38a. Understandably, Mr. Monsalvo asked the Board to reconsider that conclusion before he proceeded to court, giving the agency in the first instance the chance to address his argument that the phrase "60 days" in § 1229c(b)(2) and his order of removal extends a deadline falling on a weekend or legal holiday to the next business day. See *supra*, at 718. It was only after the Board rejected that view that he required judicial intervention. And nothing prevented him from seeking it in a challenge to the Board's reconsideration order, for that order expressly interpreted a term in his final order of removal and Mr. Monsalvo's judicial petition contested that interpretation as a matter of law.

B

The government does not dispute that Mr. Monsalvo presented the Tenth Circuit with a legal question about how long he had to depart before facing removal. See Brief for Respondent 18–20. But, the government insists, § 1252(a)(1) requires more. To secure judicial review, the government says, an individual must include in his petition some challenge to his "removability" from this country. *Ibid.* And because Mr. Monsalvo's petition didn't do that, but pressed only a question about his voluntary-departure deadline, the court was powerless to hear his case.

To be sure, the government emphasizes, things could have worked out differently for Mr. Monsalvo. All he had to do, the government says, was bundle his question about the operation of his voluntary-departure deadline with some chal-

lenge to the Board's conclusion that he was removable. *Id.*, at 20. So, for example, in addition to asking the Tenth Circuit to review the Board's order denying his motion for *reconsideration* (and rejecting his interpretation of §1229c(b)(2)), he could have asked for review of the Board's order denying his motion to *reopen* (and concluding he was not entitled to have his removal canceled). Had he done that, the government assures us, the Tenth Circuit would have had jurisdiction over his petition and could have addressed both questions. *Id.*, at 20.

The government does not deny that, under its view, some people will have to "make up a completely meritless claim in order to get jurisdiction." Tr. of Oral Arg. 57–58. By the conclusion of administrative proceedings, individuals like Mr. Monsalvo may no longer think they have a viable challenge to their removability, only some other colorable and consequential question about their final orders of removal. But, as the government sees it, they cannot simply bring that live question to court. They must either adorn their judicial petitions with a pointless challenge to their removability or forfeit the right to review altogether.

We see nothing in §1252 that puts litigants to that kind of choice. The statute does not say that an individual must press a challenge to one term in a final order of removal (a finding of "removability") just to secure judicial review of another (like a voluntary-departure deadline). In fact, the word "removability" does not even appear in the statute. Instead, §1252 authorizes courts to review "final order[s] of removal" and address "questions of law . . . arising from" them. §§1252(a)(1), (b)(9). And pretty plainly, that language permits a court to review *all* terms in a final order of removal without anything like the qualification the government imagines.

Our dissenting colleagues see things differently. In their view, this Court's decision in *Nasrallah* v. *Barr*, 590 U. S.

573 (2020), requires us to adopt the government's jurisdictional theory. See *post*, at 738–740 (opinion of THOMAS, J.); *post*, at 758–759 (opinion of BARRETT, J.). But, if anything, that case supports our conclusion. *Nasrallah* described a "final order of removal" subject to judicial review as a final order "'concluding that the alien is deportable or ordering deportation.'" 590 U. S., at 581. And (again) that is exactly what we have here: a final order specifying that the government may remove Mr. Monsalvo if he fails to depart voluntarily within 60 days, and a petition asking the courts to settle a dispute over what that order means.

JUSTICE THOMAS highlights *Nasrallah*'s holding that a Board order denying relief under the Convention Against Torture (CAT) in that case was "not part of the removal order." *Post*, at 739 (dissenting opinion). But we fail to see the relevance of that holding to this case. A CAT order provides that, "notwithstanding" a removal order, the government may not remove an individual to a particular "designated country." *Nasrallah*, 590 U. S., at 582. CAT orders, moreover, have a distinct statutory basis from removal orders, and different statutes govern their review. *Id.*, at 579–580. No such order is in play here. Mr. Monsalvo has not sought judicial review of a CAT order, only review about the meaning of his final order of removal.

JUSTICE BARRETT, for her part, reads *Nasrallah* as suggesting that an individual like Mr. Monsalvo may not challenge the Board's interpretation of a term in his removal order. Instead, he may ask a court only to change or excise a term in his removal order. See *post*, at 759 (dissenting opinion). But *Nasrallah* held nothing of the kind. Nor is it possible to square such a view with the statutory text. Section 1252 permits individuals to petition for judicial review of "final orders of removal" and indicates that those petitions supply the exclusive means for securing "[j]udicial review of all questions of law." §1252(b)(9). Nothing in the statu-

tory text contains anything like the limitation the dissent supposes, permitting judicial review of only certain *kinds* of legal errors.[1]

## III

### A

That takes us to the merits. The Board's final order of removal permitted the government to detain and remove Mr. Monsalvo if he failed to leave the country within "60 days . . . , the maximum period allowed by" § 1229c(b)(2). App. to Pet. for Cert. 40a. Everyone agrees the proper construction of that order is "governed by" the proper construction of § 1229c(b)(2). 88 F. 4th, at 1308. Like Mr. Monsalvo's final order of removal, that statute sets forth a deadline expressed in terms of a number of "days." See § 1229c(b)(2) ("Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days"). But what does that mean: Does every calendar day count? Or does the statute operate to extend a deadline that falls on a weekend or legal holiday to the next business day?

---

[1] Separately, the dissents suggest that we should remand this case to the Tenth Circuit to address the government's "late-breaking" jurisdictional objection. *Post*, at 736 (opinion of Thomas, J.); see also *post*, at 760 (opinion of Barrett, J.). But the government's objection is not a new one— it has challenged statutory jurisdiction throughout the life of this litigation, even if it has pursued various and shifting theories to support its objection. See Brief for Respondent in No. 22–9576 (CA10), pp. 36–38; Brief for Respondent 15–20. Nor do the dissenters dispute that this Court may "dispose of . . . recently raised jurisdictional argument[s]." *Caraco Pharmaceutical Laboratories, Ltd.* v. *Novo Nordisk A/S*, 566 U. S. 399, 412, n. 5 (2012).

Separately still, Justice Thomas suggests that we have developed an argument for jurisdiction that Mr. Monsalvo did not present. See *post*, at 743 (dissenting opinion). That charge is mistaken. Our analysis here tracks Mr. Monsalvo's contention that his case satisfies § 1252 because he sought judicial review of the Board's "resolution of the disputed timeliness issue," which turned on the "terms of [his] final removal order." Reply Brief 4–5.

In truth, the statute is susceptible to both understandings. An ordinary reader might understand "days" to mean calendar days, no more or less. That is how the Board and the Tenth Circuit saw it. See *supra*, at 717–719. And, to be sure, we usually assume statutory terms bear their ordinary meaning "until and unless someone points to evidence suggesting otherwise." *Niz-Chavez*, 593 U. S., at 163. But here, evidence suggesting the possibility of specialized meaning does exist. In legal settings, the term "days" is often understood to extend deadlines falling on a weekend or legal holiday to the next business day. Various federal rules reflect this understanding. See, *e. g.*, Fed. Rule Civ. Proc. 6(a)(1)(C). As do our own. See this Court's Rule 30(1). The Ninth Circuit and the immigration judge in this case thought § 1229c(b)(2) of a piece with that practice. See *supra*, at 715–716, 719. The question before us thus boils down to whether § 1229c(b)(2) uses the term "days" in its ordinary or specialized sense.

To resolve that question, we turn to one of this Court's customary interpretive tools. When Congress adopts a new law against the backdrop of a "longstanding administrative construction," this Court generally presumes the new provision should be understood to work in harmony with what has come before. *Haig* v. *Agee*, 453 U. S. 280, 297–298 (1981); accord, *United States* v. *Hill*, 506 U. S. 546, 553–554 (1993); *FDIC* v. *Philadelphia Gear Corp.*, 476 U. S. 426, 437 (1986).

That presumption is all but dispositive here. For many years, Congress has authorized the executive branch to draw up regulations to enforce the immigration laws. See 8 U. S. C. § 1103(a)(3). And since at least the 1950s, those regulations have provided that, when calculating the deadline for the "taking [of] *any action*," the term "day" carries its specialized meaning by excluding Sundays and legal holidays if a deadline would otherwise fall on one of those days. 8 CFR § 1.1(a)(6) (1958) (emphasis added). In all the years since, the only notable change to this rule has been the addi-

tion of Saturdays to the list of excluded days. 52 Fed. Reg. 2935 (1987). Congress adopted § 1229c(b)(2) against the backdrop of this consistent, longstanding administrative construction. And, given that, we presume the statute employs the same understanding.[2]

Nor do we see anything in the statute that might overcome our usual presumption. To the contrary, what evidence we have before us only supports its application. Congress set forth the maximum number of "days" allowed for voluntary departure in § 304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). In the same section of that law, Congress also provided individuals a certain number of "days" to file motions to reopen or to reconsider. 110 Stat. 3009–593; 8 U. S. C. §§ 1229a(c)(6)(B), (c)(7)(C)(i). When it comes to those latter provisions, the government concedes, the term "days" is best read in light of pre-existing regulatory practice and thus takes its specialized meaning. Brief for Respondent 43–44. Everyone agrees, then, that two provisions in § 304 operate to roll a deadline falling on a weekend or legal holiday over to the next business day. And if two provisions in a single section of an Act of Congress use the term "days" this way, it is all the more sensible to think a third provision in the same section does as well. After all, "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp.* v. *Reliant Energy Services, Inc.*, 551 U. S. 224, 232 (2007). And, if anything, that maxim may be "doubly appropriate" where, as here, Congress employed the same term in multiple places "at the same time" in the "same section of the [same] public law." *Id.*, at 231–232.

Tellingly, too, if Congress meant to depart from settled immigration practice when it adopted the voluntary-

─────────

[2] Though § 1229c(b)(2) uses the plural "days," and the regulation uses the singular "day," no one before us has suggested that distinction makes a difference. Cf. 1 U. S. C. § 1 ("[W]ords importing the plural include the singular," and vice versa).

Opinion of the Court

departure deadline in 1996, the government itself seems not to have noticed.  After Congress enacted IIRIRA, the government promulgated a new rule to enforce § 1229c(b)(2)'s terms.  See 62 Fed. Reg. 10312, 10372 (1997).  Tracking the statute, that rule allows an immigration judge to grant a voluntary-departure period of up to "60 days."  8 CFR § 240.26(e) (1999).  And under the government's own regulations, remember, regulatory deadlines defined in terms of days do not expire on weekends or legal holidays. § 1001.1(h) (2021).  Nowhere does the government's rule enforcing § 1229c(b)(2) suggest that it is exempt from these regulations.[3]  Perhaps for this reason, the immigration judge in Mr. Monsalvo's own case understood his voluntary-departure deadline to extend past a weekend to a Monday.  See *supra*, at 716.  Perhaps for this reason, as well, many other immigration judges have done the same in other cases.  See Brief for American Immigration Lawyers Association as *Amicus Curiae* 4 (collecting examples).

B

In response to our merits analysis, the government and JUSTICE ALITO offer three principal counterarguments. But, thoughtful as they are, we find none sufficient to overcome the presumption that § 1229c(b)(2) follows the government's own longstanding practice.

First, the government and JUSTICE ALITO stress the limited reach of the regulation defining the term "day."  Yes, they admit, that rule has long indicated that deadlines ex-

_____

[3] JUSTICE ALITO notes that the government's rule provides that "'the total period of time [to voluntarily depart shall not exceed] 60 days *as set forth in Section 240B of the Act.*'"  *Post*, at 757, n. 3 (dissenting opinion) (quoting 8 CFR § 1240.26(f) (2024)).  But we fail to see how the language he emphasizes moves the needle.  As we have seen, the relevant section of the Act does not define "days."  Meanwhile, the government's own rules instruct that regulatory deadlines like this one should be construed consistent with the specialized meaning of the term "day."  Nor does anything in this regulation disavow that approach.

pressed in days do not expire on weekends or legal holidays. And yes, they agree, the definition applies for "computing the period of time for taking *any action* provided in this chapter." 8 CFR § 1.1(h) (1996) (emphasis added). But, they observe, that rule applies only to regulatory deadlines and does not purport to control statutory deadlines like the one found in § 1229c(b)(2). Brief for Respondent 43; *post*, at 752 (dissenting opinion).

That much is true, but also irrelevant. The question before us isn't whether a regulation can trump a statute (of course not). It is whether Congress's work in § 304 of IIRIRA should be read in light of the government's longstanding regulatory practice. And, again, even the government concedes that the answer is (mostly) yes. *Supra*, at 726. When speaking of the "days" available for filing motions to reopen or to reconsider in § 304, the government admits, Congress meant to follow the pre-existing regulatory practice rolling over deadlines falling on weekends and legal holidays to the next business day. Brief for Respondent 43–44. Nothing in the government's argument here supplies a reason to suppose Congress meant the term "days" to work differently when it comes to the voluntary-departure deadline found in the same section of IIRIRA.[4]

Second, and attempting to address this deficiency, the government and JUSTICE ALITO highlight the fact that, when setting the deadlines for motions to reopen or to reconsider in § 304, Congress codified pre-existing deadlines found in immigration regulations (90 days and 30 days, respectively). By contrast, when Congress selected 60 days as the voluntary-departure deadline, it did not pull that number

---

[4] JUSTICE ALITO questions our reliance on the government's concession that the specialized meaning of "days" applies to other deadlines in § 304 of IIRIRA. See *post*, at 754–755 (dissenting opinion). But our colleague does not dispute the correctness of that concession and, in the end, seems to embrace it. See *post*, at 753, 756 (endorsing the specialized meaning of "days" for § 304's "filing" deadlines).

from a pre-existing regulatory deadline. Given that difference, the argument goes, Congress must have meant the word "days" to work differently when it comes to the voluntary-departure deadline alone. Brief for Respondent 43–44; *post,* at 756–757 (dissenting opinion).

That conclusion, however, does not follow from its premise. Exactly nothing in §304 hints that deadlines found there should operate differently. Nor does the regulatory backdrop against which Congress legislated. Recall that, by 1996, the government's regulations had long provided—categorically and without exception—that the term "day" excludes certain weekends and legal holidays when it comes to calculating the deadline for "taking *any action,*" of whatever kind, required by regulation. 8 CFR §1001.1(h) (emphasis added). Again, too, if Congress meant to pursue a more parsimonious approach for the voluntary-departure deadline in §304, it is curious that the government itself did not seem to advance that view when it promulgated its own rule to enforce that deadline. See 8 CFR §1240.26(e); *supra,* at 727, and n. 3.

Third, coming at the problem from a different direction, the government and JUSTICE ALITO suggest that we should divide §304's deadlines into "procedural" and "substantive" categories. Brief for Respondent 15, 22; *post,* at 751, 753, 756 (dissenting opinion). For "procedural" deadlines, like those for motions to reopen and reconsider, the government and dissent concede, it makes sense to think Congress legislated against the administrative backdrop we have described, given that the agencies and courts where those motions must be filed are usually closed on weekends and legal holidays. But that consideration is immaterial, the government and JUSTICE ALITO insist, for the "substantive" duty of voluntary departure. After all, an individual can leave the country almost anytime; even if agencies and courts close for the weekend or a legal holiday, airports and roads generally remain open.

Opinion of the Court

Maybe the procedural/substantive distinction the government and dissent propose would make for good policy. But if Congress had something like that in mind, it never said so. Section 304's text does not draw any lines between procedural and substantive duties. Nor does the regulatory background against which the statute was adopted hint at such a distinction. As we have seen, the government's longstanding definition of the term "day" excludes certain weekends and holidays when calculating the time for taking "any action" under immigration regulations—including when it comes to various "substantive" actions that can plainly be accomplished on a weekend or holiday, like "getting married after entering the United States on a fiancé(e) visa." Brief for Petitioner 38. Notably, as well, the government's own regulations enforcing § 304 make no mention of a procedural/ substantive distinction either. *Supra,* at 724–726.

Perhaps, too, Congress had good reason for eschewing the line the government and dissent would have us draw. Often enough, as it happens, a "substantive" duty that can be performed on any given day will be intertwined with a "procedural" duty that can be discharged only on days when agencies and courts are open. Mr. Monsalvo's case reflects this reality. In it, the effective (procedural) deadline for his motion to reopen turned on the calculation of the (substantive) deadline for voluntary departure. See *supra,* at 717–718. In light of that reality, a rational Congress might have thought it sensible to extend the same rule to both the procedural and substantive deadlines in § 304. Of course, whether anyone in Congress gave so much as a passing thought to questions like that is anyone's guess. But one thing is certain: The statutory text Congress chose in § 1229c(b)(2) shows no more sign of a procedural/substantive distinction than the government's own longstanding rules.[5]

───────────

[5] Briefly advancing a separate argument that the government has not advanced for itself, JUSTICE ALITO suggests that the specialized meaning of "days" cannot be applied sensibly to *other* deadlines governing, for ex

\*

As we see it, §1229c(b)(2)'s deadline works like others found in §304 of IIRIRA—and so many others in immigration law. Here, as elsewhere, the term "days" operates to extend a deadline that falls on a weekend or legal holiday to the next business day. Because the Tenth Circuit held otherwise in addressing Mr. Monsalvo's petition, its judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE ALITO joins, and with whom JUSTICE KAVANAUGH and JUSTICE BARRETT join as to Parts I and II, dissenting.

This Court granted certiorari to decide whether the deadline for a removable alien to voluntarily depart the United States extends to the next business day if it would otherwise fall on a weekend or public holiday. See 8 U. S. C. §1229c(b)(2). But, the merits-stage briefing revealed a serious, novel jurisdictional objection that may bar our review. Given that complication, we should have vacated and remanded for the Tenth Circuit's consideration in the first instance. Instead, the majority reaches the merits after finding jurisdiction based on a flawed theory of its own creation. I respectfully dissent.

I

The Immigration and Nationality Act (INA), 66 Stat. 163, 8 U. S. C. §1101 *et seq.*, "governs how persons are admitted to, and removed from, the United States." *Pereida* v. *Wilkinson*, 592 U. S. 224, 227 (2021). In 1996, Congress enacted "comprehensive amendments" to the INA through the Illegal

---

ample, how long an "alien crewman" may remain in this country. *Post*, at 752 (dissenting opinion) (discussing 8 U. S. C. §1282(a)). But, as we have sought to stress, different statutes passed at different times against different regulatory backdrops may bear different meanings, and all we address today is the meaning of §1229c(b)(2).

Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–546. *INS* v. *St. Cyr*, 533 U. S. 289, 292 (2001). This case concerns two of IIRIRA's reforms: its imposition of strict deadlines for voluntary departure, and its curtailment of an alien's right to judicial review.

### A

"Voluntary departure" is a discretionary form of immigration relief under which "certain favored aliens" can "leave the country willingly," in lieu of deportation. *Dada* v. *Mukasey*, 554 U. S. 1, 8 (2008). This relief strikes a bargain between the Government and eligible aliens. The Government saves time and money by shifting the costs of departure onto the alien. In exchange, the alien retains some control over the timing and destination of his departure and escapes the penalties that follow formal deportation. *Ante*, at 715.

IIRIRA tightened this bargain by "curtail[ing] the period of time during which an alien may remain in the United States pending voluntary departure." *Dada*, 554 U. S., at 9. Gone are the days when aliens permitted to voluntarily depart could "'continue their illegal presence in the United States for months, and even years.'" *Ibid.* Now, a voluntary-departure period granted at the end of an alien's removal proceedings cannot "excee[d] 60 days." § 1229c(b)(2). Aliens who fail to timely depart face stringent penalties, including a 10-year period of ineligibility for various forms of immigration relief. § 1229c(d)(1); *ante*, at 716.

To enforce the voluntary-departure deadline, the immigration judge (IJ) or Board of Immigration Appeals (BIA) must enter an "alternate order of removal" alongside any grant of voluntary departure. 8 CFR §§ 1240.26(d), (k)(1) (2024). That order goes into effect automatically if an alien does not depart by the deadline.

IIRIRA also permits an alien to give up his grant of voluntary departure and pursue other administrative relief.

*Dada*, 554 U. S., at 21.   The alien may at any time before his voluntary-departure deadline move to reopen his removal proceedings or move for reconsideration of his case. § 1240.26(e)(1).   If the alien acts before the deadline, then his motion will "automatically terminat[e] the grant of voluntary departure" and cause the "alternate order of removal [to] take effect," but the alien will not be subject to the penalties for failure to timely depart.   §§ 1240.26(c)(3)(iii), (e)(1).   If the deadline "has already expired," however, then a filing "does not in any way impact the period of time allowed for voluntary departure" or, outside an exception not relevant here, the penalties for failing to timely depart. § 1240.26(e)(2).

B

Beyond its substantive constraints, IIRIRA also "instituted a new" and "significantly more restrictive" scheme for judicial review.   *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 475 (1999) (*AADC*).   That scheme makes the "final order of removal" the linchpin of an alien's right to judicial review.   8 U. S. C. § 1252.

A final order of removal is "a final order 'concluding that the alien is deportable or ordering deportation.'"   *Nasrallah* v. *Barr*, 590 U. S. 573, 579 (2020) (quoting § 1101(a)(47)(A)).   Under § 1252, an alien can obtain judicial review of such an order by filing a petition for review in a federal court of appeals.   § 1252(a)(1).   That section also makes review of "all questions of law and fact" arising from an alien's removal proceedings available "only in judicial review of a final order" of removal, unless there is an independent jurisdictional basis.   § 1252(b)(9).

Our precedents have interpreted § 1252 to permit judicial review only of the final order of removal itself and two closely related categories of orders.   *First*, "rulings that affect the validity of the final order of removal," such as an IJ's evidentiary rulings, "merge into the final order of removal for purposes of judicial review."   *Id.*, at 582.   *Second*,

Thomas, J., dissenting

certain rulings that have an independent jurisdictional basis, such as an order regarding Convention Against Torture (CAT) relief, "may be reviewed together with the final order of removal." *Id.*, at 582–583, 585. Beyond these categories, however, the federal courts lack jurisdiction over removal-related determinations. See *Reyes Mata* v. *Lynch*, 576 U. S. 143, 147 (2015).

C

Petitioner Hugo Monsalvo Velázquez is an alien who was granted voluntary departure at the end of his removal proceedings. Before the IJ, he conceded removability but sought CAT relief or withholding of removal based on an alleged risk of future persecution. He asked for voluntary departure in the alternative. The IJ granted only voluntary departure, while also entering the requisite alternate order of removal. On appeal, the BIA reset the voluntary-departure period after it affirmed the IJ's denial of other relief.

The BIA set Monsalvo's new voluntary-departure period to run for the 60 days following its decision, which issued on October 12, 2021. Measured by calendar days, a 60-day period would end on Saturday, December 11, 2021.

On Friday, December 10, 2021, Monsalvo submitted a motion to reopen his removal proceedings via overnight delivery service. The motion asserted that, following this Court's decision in *Niz-Chavez* v. *Garland*, 593 U. S. 155 (2021), Monsalvo was newly eligible for cancellation of removal. Pursuant to a BIA policy not challenged here, this after-hours motion was not deemed filed until Monday, December 13, 2021, when the BIA was next open to receive filings. See BIA Practice Manual § 3.1(a)(1), https://www.justice.gov/eoir/reference-materials/bia.

The BIA denied Monsalvo's motion both on the merits of his *Niz-Chavez* claim and based on the timing of his filing. On its view, "[t]he 60-day period of voluntary departure terminated on December 11, 2021." App. to Pet. for Cert. 38a.

Because Monsalvo had failed to depart by that deadline, his December 13 reopening motion came when he was already subject to IIRIRA's penalties for failing to timely depart, including "ineligibil[ity] for . . . cancellation of removal." *Ibid.*   Thus, Monsalvo was ineligible for his requested relief.

After Monsalvo moved for reconsideration of only the timing holding, the BIA reaffirmed its position.  "[N]o provision[,] statute[,] or regulation extend[s] the last day of the voluntary departure period f[a]lling on a weekend or a legal holiday to the next business day," it explained, so 60 days means 60 calendar days.  *Id.*, at 34a–35a.

Monsalvo petitioned the Tenth Circuit for review of the BIA's reconsideration ruling.  He argued that, when the voluntary-departure deadline would otherwise fall on a weekend or holiday, it rolls over to the next business day. In deciding his petition, the Tenth Circuit first rejected the Government's arguments for why it lacked statutory jurisdiction under § 1252 to review the petition.  On the merits, the court ruled for the Government, agreeing with the BIA that 60 days means 60 calendar days.

We granted certiorari to review the Tenth Circuit's merits holding.   603 U. S. 903 (2024).   But, since then, much of the briefing—and our focus at oral argument—has centered on the threshold issue of statutory jurisdiction.

The Government raised before this Court a new objection to the Tenth Circuit's jurisdiction: that Monsalvo's petition could not support jurisdiction because it did not bear on his removability.  The Government emphasized that Monsalvo had asked the Tenth Circuit to review only the denial of his motion for reconsideration, which, unlike his motion for reopening, did *not* ask the BIA to reopen his removal proceedings.   Accordingly, he was asking only "to alter a nondispositive portion of the Board's reasoning in its prior decision declining to reopen proceedings."   Brief for Respondent 19. That unusual request, the Government contended, did not fall into any category cognizable under § 1252.

## II

In view of the Government's serious, late-breaking juris-dictional objection, we should have vacated and remanded for the Tenth Circuit's review. Although "[o]bjections to a tribunal's jurisdiction can be raised at any time," *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153 (2013), we need not resolve a belated objection ourselves.

Our "usual practice" is to refrain from deciding "legal . . . questions in the first instance." *CRST Van Expedited, Inc.* v. *EEOC*, 578 U. S. 419, 435 (2016). "[W]e are a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). Accordingly, we ordinarily wait to see if "the crucible of adversarial testing . . . , along with the experience of our thoughtful colleagues on the district and circuit benches, [can] yield insights (or reveal pitfalls) we can-not muster guided only by our own lights." *Maslenjak* v. *United States*, 582 U. S. 335, 354 (2017) (GORSUCH, J., concur-ring in part and concurring in judgment).

This Court has routinely vacated and remanded cases so that lower courts can be the first to address significant new developments. *Zubik* v. *Burwell*, 578 U. S. 403, 408–409 (2016) (*per curiam*) (collecting cases). In a number of cases, we have taken this course based on emergent jurisdictional matters specifically. See, *e. g.*, *Frank* v. *Gaos*, 586 U. S. 485, 488, 492–493 (2019) (*per curiam*); *Insurance Co. of Pa.* v. *Ben Cooper, Inc.*, 498 U. S. 964 (1990).

I would do the same here. Not only was the jurisdictional issue before us not raised below, but until this point it has not been passed upon by *any* court. Tr. of Oral Arg. 12, 67.[1]

Caution is also especially important for jurisdictional mat-ters. "Congress' power over federal jurisdiction is 'an es-

---

[1] The majority cannot sidestep the novelty of the jurisdictional issue before us by highlighting that the Government raised other objections to statutory jurisdiction below. *Ante*, at 724, n. 1. The point remains that the Government did not raise, and the Tenth Circuit had no opportunity to consider, the important objection contested before this Court.

sential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects.'" *Patchak* v. *Zinke*, 583 U. S. 244, 254 (2018) (plurality opinion) (quoting *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 101 (1998)). When we assume jurisdiction too hastily, we risk aggrandizing ourselves at the expense of the political branches.

There is no reason for the Court's intervention today. We did not grant certiorari to address jurisdiction, and—as its novel status reflects—the jurisdictional question plainly is not so pressing as to require immediate resolution. Nor is the underlying question presented so important as to require resolution in this case. That question too arises only rarely: As the Tenth Circuit recognized, its decision below resolved "an issue of first impression in th[at] court," which had been "addressed before by only one other circuit." *Velazquez* v. *Garland*, 88 F. 4th 1301, 1305 (2023).

Of course, we should not hesitate to brush aside baseless jurisdictional objections. But, the issue here cannot be dismissed on that ground. The Government has raised a serious objection based on the tension between §1252's removal-focused jurisdictional framework and Monsalvo's choice to seek review only of a claim unrelated to removability. We should not be "the first"—and only—"court in the Nation" to address that tension. *Yee* v. *Escondido*, 503 U. S. 519, 538 (1992).

## III

If required to decide the jurisdictional question, however, I would conclude that the Tenth Circuit lacked jurisdiction over Monsalvo's petition. "[T]he party invoking federal jurisdiction bears the burden of establishing its existence," and, on the admittedly limited briefing before us, Monsalvo has not met his burden. *Steel Co.*, 523 U. S., at 104. In contending otherwise, Monsalvo and the majority offer two distinct theories of jurisdiction, but neither holds up.

### A

The difficulty for Monsalvo stems from his litigation strategy below.   He asked the Tenth Circuit to review only the BIA's denial of his reconsideration motion.   *Supra*, at 735. That motion, in turn, challenged only one of the BIA's two bases for denying his reopening motion.   *Supra*, at 734–735. Monsalvo objected to the BIA's conclusion that the motion was untimely, but not its conclusion that it also failed on the merits.   *Ibid.*   In other words, the Government is right to say that, before the Tenth Circuit, he sought only "to alter a nondispositive portion of the Board's reasoning" for denying reopening.   Brief for Respondent 19.

That framing fits poorly with §1252, which ties jurisdiction to a narrow version of the term "final order of removal." Before IIRIRA, the predecessor term "final order of deportation" covered "'all determinations made during and incident to the administrative proceeding' on removability." *Nasrallah*, 590 U. S., at 584 (quoting *Foti* v. *INS*, 375 U. S. 217, 229 (1963)).   But, under IIRIRA, a "final order of removal" is only the "final order 'concluding that the alien is deportable or ordering deportation.'"   590 U. S., at 579 (quoting §1101(a)(47)(A)).

*Nasrallah* made clear that a "final order of removal" refers only to the portion of an IJ or BIA decision that finds or orders removability, not the entirety of that decision.   In that case, we considered whether an alien barred under §1252(a)(2)(C) from raising a factual challenge to his final order of removal could still factually challenge the denial of CAT relief.   *Id.*, at 576.

We began by considering the nature of the CAT denial. In the underlying BIA decision, that denial immediately preceded the alien's removal order:

> "FURTHER ORDER: The Immigration Judge's order granting the respondent's application for deferral of removal under the Convention Against Torture is vacated.

> "FURTHER ORDER: The respondent is ordered removed from the United States to Lebanon pursuant to the Immigration Judge's August 11, 2016, order."   App. to Pet. for Cert. in *Nasrallah* v. *Barr*, O. T. 2019, No. 18–1432, p. 21a.

Still, every Member of this Court recognized that the CAT denial was a distinct order, and not part of the removal order.   590 U. S., at 582; *id.*, at 591 (Thomas, J., dissenting).

The *Nasrallah* majority then concluded that the distinct status of a CAT order preserved Nasrallah's factual challenge to that order.   On its understanding, § 1252(a)(2)(C) constrained only Nasrallah's ability to challenge his final order of removal itself, plus any "rulings that affect[ed] the validity of the final order of removal" and so "merge[d] into the final order of removal for purposes of judicial review." *Id.*, at 582.   Because the CAT order fell into neither category, and instead had a separate jurisdictional basis, Nasrallah could still pursue his factual challenge to the CAT order "together with the pending order of removal."   *Id.*, at 582–583.[2]

Although this conclusion aided Nasrallah, it cuts against Monsalvo.   Unlike a CAT claimant, Monsalvo cannot point to any basis for jurisdiction other than § 1252(a)(1).   To establish jurisdiction, he must show that his petition before the Tenth Circuit challenged either the final order of removal

--------

[2] I adhere to my disagreement with *Nasrallah*'s disposition.   See 590 U. S., at 589–591 (dissenting opinion).   On my view, the § 1252(a)(2)(C) bar applies to all claims governed by § 1252(b)(9)'s "zipper clause." *Ibid.* That clause "consolidates 'all questions of law and fact . . . *arising* from any action taken or proceeding brought to remove an alien'" into review of the final order of removal, where they are equally subject to § 1252's "limitations on final orders of removal." *Id.*, at 591–592. "'Arising from'" is a sweeping term, and a CAT order issued during a removal proceeding falls within its ambit. *Id.*, at 591.   Regardless, because this case turns on jurisdictional categories to which the *Nasrallah* majority agreed that the zipper clause applies, my disagreement is of no moment here.   See *ibid.*

itself, as *Nasrallah* construed it, or at least the validity of that order.  *Supra*, at 733–734.  But, in seeking review only of a "nondispositive portion of the Board's reasoning," Monsalvo's petition did neither.  Brief for Respondent 19.

Monsalvo all but conceded below that his petition did not bear on his final order of removal.  As he explained in his Tenth Circuit briefing, he "was *not* seeking to 'vacate the order of removal against him.'"  *Ibid.* (quoting Reply Brief for Petitioner in No. 22–9576 (CA10), pp. 5–6 (sealed)).  He explained that a ruling that the BIA was wrong about the date of his voluntary-departure deadline "'would have no effect whatever'" on "'the underlying order of removal.'"  Brief for Respondent 19 (quoting Reply Brief for Petitioner in No. 22–9576 (CA10), at 5; emphasis deleted).  Monsalvo sought only a collateral advantage: If his voluntary-departure deadline did not expire until December 13, then his motion to reopen—filed the same day—would have canceled his grant of voluntary departure without making him subject to the penalties associated with failing to timely depart, such as "ineligibility for future immigration relief."  88 F. 4th, at 1307.

It thus is not apparent how the Tenth Circuit had jurisdiction to hear Monsalvo's case.  Section 1252 allows review of a limited range of removal-related matters; it is not a vehicle to head off unwanted postremoval consequences.

B

Monsalvo's attempt to reconceptualize his challenge is unpersuasive.  He argues before this Court that the penalties for failing to timely depart are not collateral consequences, but terms of his final order of removal.  Reply Brief 4.  If we recognized that his motion to reopen was filed *before* his voluntary-departure deadline, he says, then those terms would disappear, and the order would transform into one "*without* any severe penalties."  *Ibid.*

Monsalvo divines this conclusion from the BIA's original decision on his removability, in which the BIA affirmed the IJ's denial of CAT and withholding relief. Monsalvo reads that decision to state that, if he failed to timely depart, a final order of removal with "three distinct terms" would go into effect: first, that he "'shall be removed'"; second, that he "'shall be subject to a [monetary] penalty'"; and third, that he "'shall be ineligible for a period of 10 years for any further relief under [certain INA provisions].'" *Id.*, at 5 (quoting App. to Pet. for Cert. 42a–43a). "If the Tenth Circuit had granted the petition for review," he says, "the result would have been to delete Clauses 2 and 3" from this removal order. Reply Brief 5.

This argument conflicts with *Nasrallah*. Again, that decision made clear that a final order of removal refers only to the portion of the IJ's or BIA's decision "'concluding that the alien is deportable or ordering deportation.'" 590 U. S., at 579 (quoting §1101(a)(47)(A)). Other directives do not qualify, even if they are imposed concurrently. Thus, just as we recognized that the CAT order in *Nasrallah* was not a final order of removal, *id.*, at 582, an order levying penalties upon Monsalvo for failure to timely depart is also distinct. In attempting to collapse the latter order into his final order of removal, Monsalvo wrongly attempts to revive the pre-IIRIRA approach. *Supra*, at 738.

Moreover, Monsalvo misunderstands the function of the BIA's penalty language. That language did not purport to impose liability on him in the event of his failure to timely depart. Rather, it carried out the BIA's statutory obligation to give him "notice" of the penalties listed in the INA for untimeliness:

> "NOTICE: If a respondent fails to voluntarily depart the United States within the time period specified, or any extensions granted by the DHS, the respondent *shall be subject to a civil penalty* as provided by the

> regulations and the statute, and *shall be ineligible for a period of 10 years for any further relief under* [certain INA provisions]. *See* section 240B(d) of the [INA]." App. to Pet. for Cert. 42a–43a (emphasis added).

See also § 1229c(d)(3).

In other words, even if the "notice" paragraph could be considered part of his final order of removal, the statements therein are not "terms" of an order that restrict Monsalvo. Rather, those statements merely notify Monsalvo of the law. They retain the same force and effect whether or not Monsalvo met his voluntary-departure deadline. The underlying source of Monsalvo's current exposure to liability is instead the INA. § 1229c(d) (codifying INA § 240(B)(d), 110 Stat. 3009–597). So, the "notice" paragraph is not the true target of Monsalvo's petition, and it cannot supply jurisdiction.

The same is true of the IJ order that the BIA incorporated by reference. That order is the alternate order of removal that the IJ entered when granting voluntary departure. See *supra*, at 734. It simply stated that "respondent shall be removed to Mexico on the charge in his Notice to Appear." App. to Pet. for Cert. 51a. And, although the IJ's decision also warned of the statutory consequences associated with untimeliness, this warning too was just an acknowledgment of the "penalties . . . under Section 240B(d)." *Id.*, at 51a–52a. So, that removal order is no more helpful for Monsalvo.

In short, Monsalvo's theory rests on a misunderstanding of both the scope of a final order of removal and the meaning of the supposed "terms" of this order. Because he bears the jurisdictional burden, these shortcomings should be dispositive. *Steel Co.*, 523 U. S., at 104.[3]

---

[3] To the extent Monsalvo suggests that courts of appeals have jurisdiction to review reconsideration decisions as a categorical matter, he misreads both 8 U. S. C. § 1252 and *Reyes Mata* v. *Lynch*, 576 U. S. 143 (2015). Section 1252(b)(9) does not authorize review of "'all questions of law and fact . . . arising from' the removal proceedings." Reply Brief 3. Rather, it specifies that, absent an independent jurisdictional basis, such questions

C

For its part, the majority declines to defend Monsalvo's jurisdictional theory. Arguments for jurisdiction are not exempt from principles of party presentation and forfeiture, so that choice should be the end of the jurisdictional road. See, *e. g.*, *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 434–435, n. 6 (2021).

Instead, the majority develops its own theory for jurisdiction, based on reasoning that appeared nowhere in the briefing or at oral argument. The majority agrees with Monsalvo that he seeks review of a "term" in his final order of removal, but it identifies the relevant term as the BIA's provision of a 60-day voluntary-departure period. *Ante*, at 720. And, the majority concludes, the Tenth Circuit had authority to interpret the meaning of "60 days" in this "term" under its jurisdiction to review "'final order[s] of removal'" and "'questions of law . . . arising from' them." *Ante*, at 722 (quoting §§ 1252(a)(1), (b)(9)). The majority errs with both premises.

1

Like Monsalvo, the majority errs by assuming that Monsalvo's challenge goes to his final order of removal. To conclude that the grant of voluntary departure is part of Monsalvo's final order of removal, the majority appears to view the order as comprising the BIA's entire decision. See *ante*,

---

of law and fact are reviewable only if brought "in judicial review of a final order under this section." § 1252(b)(9). That language thus facilitates reviewability only if a petitioner has in fact sought review of a final order of removal.

*Reyes Mata* did not suggest otherwise in noting that courts have long reviewed reconsideration decisions, and that § 1252(b)(6) "contemplates" review of such decisions, in the course of reviewing final orders of removal. 576 U. S., at 147–148. Those points do not conflict with the rule that a petitioner generally must challenge a final order of removal before he can raise other issues alongside that challenge. See § 1252(b)(6) (permitting consolidation of a challenge to a "motion to . . . reconsider the order" "[w]hen a petitioner seeks review of an order under this section").

at 720. But, such a broad construction conflicts with *Nasrallah*'s recognition that the CAT order was distinct, even when situated alongside a final order of removal in the same decision. See *supra*, at 738–740. Following *Nasrallah*, a grant of voluntary departure is a separate order that "is not itself a final order of removal." 590 U. S., at 582. The BIA's regulations reflect that point: They speak separately of an "order granting voluntary departure" and an "order of removal." 8 CFR § 1240.26(c)(3). The scope of Monsalvo's voluntary-departure period is therefore a question about the voluntary-departure order, *not* the final order of removal.

The majority ignores *Nasrallah*'s narrow interpretation of a "final order of removal." Brushing past the logic of that decision, the majority summarily asserts that *Nasrallah* is consistent with its view that a final order of removal encompasses the entire accompanying BIA decision. *Ante*, at 723. But, *Nasrallah*'s holding (that a CAT order is " 'not part of the removal order' ") cannot be divorced from its reasoning (how to identify the removal order). Contra, *ante*, at 723.

In discarding *Nasrallah*, the majority instead relies on the parties' supposed agreement that the entire BIA decision constitutes a "final order of removal." It asserts that the parties have agreed that, "[o]n October 12, 2021, the Board issued an order which . . . constituted a final order of removal." *Ante*, at 720. But, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction," so we can accept the assumption that we are reviewing a final order of removal only if it is in fact true. *Henderson* v. *Shinseki*, 562 U. S. 428, 434 (2011).

Regardless, the majority's claim of agreement between the parties rests on a misreading of *both* parties' arguments. Although the Government agrees that the BIA decision *contains* a final order of removal, see Tr. of Oral Arg. 38, it rejects Monsalvo's position that this order and the BIA decision are one and the same. As the Government explains, it had previously taken the broader view based on pre-IIRIRA

case law, but this Court "rejected [it] in *Nasrallah*." *Id.*, at 35, 60. For his part, Monsalvo does purport to "challeng[e] the terms of his removal order," Reply Brief 5, but the majority misunderstands *which terms* Monsalvo puts in issue. It asserts that he seeks clarification of what his "order meant" with respect to his obligation "to leave voluntarily 'within 60 days.'" *Ante*, at 720. But, as explained, Monsalvo actually views the relevant terms as the statutory penalties invoked by the BIA. *Supra*, at 740–741.[4] The majority's framing of the "final order of removal" in this case rests on a stipulation that no party makes.

2

Even if Monsalvo's voluntary-departure order could be considered part of his final order of removal, it does not follow that the Tenth Circuit would have had jurisdiction over a request to clarify the meaning of "60 days." As relevant here, § 1252 confers jurisdiction only for "[j]udicial review of a final order of removal." § 1252(a)(1). The majority assumes that a request for clarification would qualify, but that assumption is debatable at best. *Ante*, at 720–721.

Until now, we have understood § 1252 to "ves[t] the courts of appeals with the authority to consider petitions challenging 'final orders' commanding the 'removal' of aliens from the United States." *Calcano-Martinez* v. *INS*, 533 U. S. 348, 350 (2001). A request for clarification about an order's meaning, standing alone, is not a *challenge* to that order. It does not ask the court to "disturb the final order of removal" in any way. *Nasrallah*, 590 U. S., at 582. Rather, it amounts to a request for a declaratory judgment, if not an advisory opinion.

_____

[4] As best I can tell, Monsalvo does not even view the "60 days" language as a term in his final order of removal. He states that the order contains only "three distinct terms"—the directive that he "'shall be removed,'" and the two clauses regarding penalties for failure to timely depart. Reply Brief 5 (quoting App. to Pet. for Cert. 42a–43a); see *supra*, at 741.

Extending § 1252 to reach such a request is hard to square with our conception of judicial review more generally. "The question before an appellate Court is, was the *judgment* correct." *McClung* v. *Silliman*, 6 Wheat. 598, 603 (1821). After all, "our power is to correct wrong judgments, not to revise opinions." *Herb* v. *Pitcairn*, 324 U. S. 117, 126 (1945).

Given that we have not previously confronted this issue, and the parties have not briefed it, I express no definitive view. But, it seems at minimum questionable whether an alien who does not oppose the disposition of his final order of removal seeks "review" of that order under § 1252.

The majority skips over this issue by resorting to § 1252(b)(9), which it reads to allow a court of appeals to address any "'questions of law . . . arising from'" a term in a final order of removal. *Ante*, at 722. But, § 1252(b)(9) is a "jurisdictional limitation," not a grant of jurisdiction. *AADC*, 525 U. S., at 482–483. It specifies that judicial review of all questions of law arising from removal proceedings "shall be available only in judicial review of a final order under this section." § 1252(b)(9). That provision thus does not say that an alien can raise any question of law. Rather, absent an independent jurisdictional basis, "a federal court has jurisdiction to review" such a question only "when the court reviews a 'final order' of removal." *Johnson* v. *Arteaga-Martinez*, 596 U. S. 573, 584 (2022) (Thomas, J., concurring). Section 1252(b)(9) accordingly does not resolve what it means for a court to "review" a final order of removal.

IV

Finally, policy considerations cannot change our analysis. The majority highlights that ruling against Monsalvo on jurisdictional grounds would lead to a curious result. We would invite pointless litigation, the majority asserts, if we held that § 1252 requires "an individual [to] include in his petition some challenge to his 'removability' from this coun-

Thomas, J., dissenting

try." *Ante*, at 721. But, even if true, this consequence is beside the point.

"[W]e must enforce the statute that Congress enacted." *Obduskey* v. *McCarthy & Holthus LLP*, 586 U. S. 466, 481 (2019). That means giving effect to Congress's decision in § 1252 to "substantially limi[t] the availability of judicial review," *Nken* v. *Holder*, 556 U. S. 418, 424 (2009), specifically by permitting review of "all questions of law . . . arising from any action taken or proceeding brought to remove an alien" only in the course of reviewing a "final order of removal." §§ 1252(a)(1), (b)(9). And, it means giving effect to *Nasrallah*'s narrow reading of the term "final order of removal."

In many cases, a petitioner will still be able to obtain judicial review even under § 1252's "more restrictive" scheme. *AADC*, 525 U. S., at 475. In *Nasrallah*, for example, the Court understood its reading of "final order of removal" to benefit Nasrallah. 590 U. S., at 582–583. But, the logic of that decision applies just the same when its effect is to preclude judicial review.

All this is not to say that § 1252 denies Monsalvo his day in court. Perhaps, as the Government suggests, things would have been different if he had also challenged the BIA's reopening decision. Brief for Respondent 20. Or, perhaps he could still pursue relief in non-removal-related litigation, such as by filing suit under the Administrative Procedure Act "after unsuccessfully seeking [the Government] to return his voluntary departure bond or to adjust his status in the country." Tr. of Oral Arg. 32. But, we cannot "rewrite the laws passed by Congress and signed by the President" to shield Monsalvo from the consequences of his choice to challenge only the BIA's reconsideration decision. *Nasrallah*, 590 U. S., at 583.

\*    \*    \*

Because "a congressional grant of jurisdiction is a *prerequisite* to the exercise of judicial power" in this case, this

Court must carefully abide by Congress's jurisdictional strictures. *Patchak*, 583 U. S., at 254 (plurality opinion). We thus should have vacated and remanded for the Tenth Circuit's consideration of the jurisdictional issue. Disregarding Monsalvo's jurisdictional burden, the majority instead finds jurisdiction based on an unpersuasive theory of its own creation. I respectfully dissent.

JUSTICE ALITO, with whom JUSTICE KAVANAUGH joins, dissenting.

I agree with JUSTICE THOMAS that the Court should remand this case for the Court of Appeals to decide in the first instance whether it possessed jurisdiction to entertain petitioner's petition for review. That case-specific argument was not raised below, and we did not grant review to decide it. If forced to decide the jurisdictional question, however, I would agree with JUSTICE THOMAS and JUSTICE BARRETT that the Court of Appeals lacked jurisdiction. But because the Court has rejected those jurisdictional arguments, I write separately to explain why, in my view, the Court's analysis of the merits is wrong.

The merits question in this case—whether petitioner left the United States within "60 days" after October 12, 2021— is straightforward. The 60th "day" after October 12, 2021, was Saturday, December 11, 2021. And petitioner failed to depart the country by that Saturday. Saturday is a day of the week, and there is no reason why petitioner could not have left the country on or before that date. Petitioner gives us no reason to believe—and I am aware of none—that the roads to Mexico, his home country, were closed; so he could have driven or taken a bus across the border. He also could have flown to Mexico or any other country that would admit him. Nevertheless, the Court holds that he was entitled to a 2-day extension because the last day of his voluntary departure deadline happened to fall on a weekend. There is no justification for that decision.

ALITO, J., dissenting

The Court is sympathetic to petitioner's plight, but the relevant statutory provision, 8 U. S. C. § 1229c(b)(2), sets a deadline, and no matter how such a deadline is calculated, there will always be those who happen to miss it by a day or so. And that will be true whether the deadline is always 60 days or is sometimes extended to 61, 62, or 63 days. There will always be a sympathetic *pro se* alien[1] who is a day or two late. Unless the Court is willing to extend the statutory deadline indefinitely, it would presumably be forced to say in such cases that a day too late is just too bad. For this reason, sympathy for petitioner cannot justify the Court's decision.

That is especially true because today's decision will affect cases other than petitioner's. We have not been told how many aliens who are granted voluntary departure are ordered to leave within a specified number of days after the date of the relevant order, but assuming that roughly the same number of such orders are issued on each day from Monday through Friday, it is probable that nearly half of the departure deadlines in such cases will fall on a Saturday, Sunday, or federal holiday. As a result, these individuals will be given a windfall that is not enjoyed by most other similarly situated aliens. As I shall explain, there is no good reason for that disparate treatment.

I

"Voluntary departure" is part of a bargain that benefits both the Government and an alien who is subject to removal. When such an alien voluntarily leaves, the Government is spared "the expense of deportation," and the alien "avoids extended detention," "can select the country of destination," and—what is perhaps most important—avoids the restric-

---

[1] The Immigration and Nationality Act uses the term "alien," which is defined as "any person not a citizen or national of the United States." 66 Stat. 166, 8 U. S. C. § 1101(a)(3). Thus, in the language of the Act, "alien" and "noncitizen" are not synonymous.

tion on readmission that results from deportation. *Dada* v. *Mukasey*, 554 U. S. 1, 11 (2008). Federal immigration law has permitted this mutually beneficial bargain for nearly a century. See Alien Registration Act of 1940, 54 Stat. 672.

That bargain is effective only if the alien lives up to his promise to depart, and in the past that promise was not always kept. For some time, voluntary departure agreements did not include a specific deadline, and some aliens who had agreed to leave "'continue[d] their illegal presence in the United States for months, and even years.'" *Dada*, 554 U. S., at 9 (quoting Letter from B. Habberton, Acting Commissioner on Immigration and Naturalization). In 1996, Congress tried to fix that problem by enacting the statutory deadline at issue here. It provides that—in typical circumstances—"[p]ermission to depart voluntarily . . . shall not be valid for a period exceeding 60 days." 8 U. S. C. § 1229c(b)(2). In compliance with this provision, the Board of Immigration Appeals (BIA) issued an order giving petitioner "60 days to voluntarily depart . . . , the maximum period allowed by [§ 1229c(b)(2)]." App. to Pet. for Cert. 40a.

We generally presume that terms used in statutes carry the same meaning they have in ordinary usage. See *Niz-Chavez* v. *Garland*, 593 U. S. 155, 160 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them"). Therefore, when interpreting the term "days" in § 1229c(b)(2), we should start with the presumption that it means what it means in ordinary usage: "a division of time equal to 24 hours and representing the average length of the period during which the earth makes one rotation on its axis." Random House Webster's Unabridged Dictionary 510 (2d ed. 2001). Saturdays, Sundays, and holidays fit this definition, so they presumptively qualify as "days" within the meaning of the stat-

ute.   Is there any reason to find that this presumption is overcome?

The Court's answer is "yes" because, in its view, the term "days," as used in the voluntary departure provision, has the special meaning that often applies in provisions that set deadlines for filing papers in a court or government office. See, *e. g.*, Fed. Rule Civ. Proc. 6(a)(1)(C); Fed. Rule App. Proc. 26(a)(1)(C).   But the justification for this special rule—the fact that filing papers in a court or government office on a weekend or holiday is often difficult or impossible—has no application where the task that must be accomplished may be done just as easily on any day of the week.   And that is certainly the case here.   Petitioner has not provided any reason why he could not have departed on Saturday December 11 or Sunday December 12.   He has not claimed, for example, that his religion prohibited him from traveling on either or both of those days.   And on those days, he could have left the United States by car, bus, or plane.   So why should anyone think that he was entitled to an extension giving him, not the 60 days prescribed by statute, but an extra two days?   In the absence of some strong contrary indication, "affected individuals and courts alike are entitled to assume statutory terms bear their ordinary meaning." *Niz-Chavez*, 593 U. S., at 163.   "[U]ntil and unless someone points to evidence" that a statute bears an alternative, "specialized" meaning, we assume that the ordinary meaning controls.   *Ibid.*   And there is nothing here that can overcome that usual assumption.

## II

### A

The Court rejects the ordinary meaning of the statutory language because, in its view, 8 U. S. C. § 1229c(b)(2) incorporated a "'longstanding administrative construction'" of the term "days," according to which a deadline in the immigration laws is taken to extend if the final day lands on a week-

end or holiday. *Ante*, at 725. But this argument fails because the regulatory definition on which it rests applies by its terms only to deadlines that appear in the immigration *regulations*. When Congress enacted the voluntary departure deadline in 1996, the pertinent regulation stated that "[t]he term *day* when computing the period of time for taking any action *provided in this chapter*"—that is, in the relevant chapter of the regulations—"shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period so computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, nor a legal holiday." 8 CFR § 1.1(h) (1996) (emphasis added).[2] So even if Congress had enacted this provision into law, it would not have affected the meaning of § 1229c(b)(2).

In an effort to draw some support from this regulation, the Court disregards its specific terms and contends that it embodied a broader rule for counting days that applies even when the action that must be taken by the deadline can be done just as easily on weekends and holidays as on ordinary business days. It is doubtful, however, that the Court is ready to embrace all the implications of this argument. The term "days" appears numerous times in the immigration laws. Does the Court think that every one of these provisions incorporates its unorthodox counting rule? Consider, for example, 8 U. S. C. § 1282(a), which provides that in most instances an "alien crewman" may not be permitted to "land temporarily in the United States" for more than 29 days. Suppose that the 29th day is a Saturday. Does that mean that the alien crewman may stay an additional two days? There are many other similar provisions. See, *e. g.,* § 1187(a)(1) (permitting the waiver of the usual visa requirements for a tourist seeking entry for up to 90 days); § 1184(d)

---

[2] A substantially identical definition now appears in 8 CFR §§ 1.2 and 1001.1(h) (2024).

(requiring certain visa applicants to establish that they are "actually willing to conclude a valid marriage" to an identified citizen within 90 days of arrival); § 1101(a)(13)(C)(ii) (providing that an already admitted alien is regarded as seeking admission if he has been absent from the United States for "a continuous period in excess of 180 days"); § 1101(f)(7) (providing that an alien is not of "good moral character" if he has been imprisoned, in a relevant timeframe, for an aggregate period of 180 days or more).

If, as I assume, the Court does not mean to hold that its unorthodox interpretation of the term "days" applies to every immigration provision that contains that term, then the most that might be said about the counting rule on which it relies is that it is presumptively incorporated when its underlying rationale—the impossibility or difficulty of compliance on a weekend or holiday—is applicable. And if that is so, that construction does not apply to the voluntary departure deadline.

I would view this case differently if it involved an administrative interpretation of a statute that contains a technical term or a term that has a special meaning in a particular industry. In *United States* v. *Hill*, 506 U. S. 546 (1993), for example, we noted "well established" treasury regulations that reflected an "accepted distinction" between the terms "mineral deposit" and "mineral enterprise," at least for the purpose of taxing certain mineral interests. *Id.*, at 553–554. And we assumed that Congress "relied" on that "accepted distinction" when it used the term "mineral deposit" in a tax provision. *Id.*, at 553. See also *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate'"). Here, however, the critical term is a commonplace word used countless times in everyday speech.

In sum, Congress had no reason to expect that the purely regulatory definition of "day" was a "longstanding administrative construction" that would in any way bear on the meaning of "day" in the voluntary departure provision.

B

Without support for its interpretation in ordinary language or any special definition that is applicable in a situation like the one at hand, the Court moves on to the presumption of consistent usage, *i. e.*, the presumption that a term has the same meaning throughout a statute. See *Powerex Corp.* v. *Reliant Energy Services, Inc.*, 551 U. S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should *normally* be given the same meaning" (emphasis added)). Invoking this presumption, the Court reasons as follows: The term "days" appears not only in the provision fixing the deadline for voluntary departure, but also in neighboring provisions that set certain filing deadlines. *Ante*, at 726 (citing 8 U. S. C. § 1229a(c)(6)(B) (motion for reconsideration of removal order "must be filed within 30 days of the date of entry of a final administrative order of removal"); § 1229a(c)(7)(C)(i) (motion to reopen removal proceedings "shall be filed within 90 days of the date of entry of a final administrative order of removal")). As the Court notes, the Government concedes that those filing deadlines extend to the next business day when the final day lands on a weekend or holiday. *Ante,* at 726 (citing Brief for Respondent 43–44). And the Court therefore concludes that the same rule should apply to the voluntary departure deadline.

By citing the Government's concession about the filing deadline provisions, the Court attempts to cloud the real question, which is whether *this Court* should interpret the term "days" in the filing provisions and the departure provision as having the same meaning or two different meanings. After all, the mere fact that the Government believes that

the section's filing deadlines should extend when they land on a weekend or holiday does not bind us. Cf. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 386–390, 412–413 (2024). And the Court's willingness to accept the Government's interpretation of the relevant provisions is notably selective. The Court eagerly adopts the Government's interpretation of the filing provisions but rejects the Government's position regarding the voluntary departure provision.

So, I repeat, the real question is what *this Court* should hold regarding the meaning of the term "days" in the provisions in question. We have three choices. First, we could hold that "days" has its ordinary meaning in both the voluntary departure and the filing provisions. Second, we could hold that the term has a specialized meaning—that it incorporates the rule that a deadline should extend when the final day lands on a weekend or holiday—in all the provisions. Or third, we could hold that the term "days" in the voluntary departure provision has the term's ordinary meaning but that the same term, as used in the filing provisions, has the specialized meaning that often applies in provisions of that kind.

The presumption of consistent usage cannot justify the choice of the second option rather than the first, and the Court does not explain why its preferred option (number two) is better than option three, which heeds the ordinary meaning of the term "days" except where there is a reason to adopt a specialized meaning. We *presume* that a term has the same meaning in all provisions of a law, but the presumption can be overcome, and there is a strong argument that it should be overcome here due to the unique rule that has long been applied to many filing deadlines.

C

Notably, when faced with the possibility that its counting rule might apply to *every* provision of the immigration laws

that includes the term "day," the Court retreats from the presumption of consistent usage. It asserts that "different statutes passed at different times against different regulatory backdrops may bear different meanings." *Ante*, at 731, n. 5. The Court agrees, then, that we must look at the specific circumstances under which the filing and the voluntary departure deadlines were enacted to determine whether the term "day" should be given the same meaning in each provision.

In this case, those circumstances support the inference that Congress intended for the filing deadlines, but not the voluntary departure deadline, to extend when the final day lands on a weekend or holiday. As the Court notes, since at least the 1950s, the immigration regulations have provided that deadlines *in the regulations* are extended when the final day falls on a weekend or holiday. See *ante*, at 725–726 (citing 8 CFR §1.1(a)(6) (1958)). When Congress enacted the statutory filing deadlines, it parroted filing deadlines that already appeared in those regulations, and it did so at the "recommendatio[n]" of the Executive Branch. *Dada*, 554 U. S., at 13–14. It is therefore quite possible that Congress had the regulatory definition of "day" in mind when it enacted the statutory filing deadlines. The same, however, cannot be said for the voluntary departure deadline because it had no regulatory precursor.

The Court dismisses this important distinction by asserting that "[e]xactly nothing in §304 hints that deadlines found there should operate differently." *Ante*, at 729. But of course, exactly nothing in §304 says that "day" should be given a specialized technical meaning either. The Court's departure from ordinary meaning is premised on its view that Congress adopted a "'longstanding administrative construction.'" *Ante*, at 725. If the Court is going to look to regulatory history to determine the meaning of the statute's terms, it cannot simply close its eyes when that regulatory

history suggests that the voluntary departure deadline should be treated differently.[3]

## D

The Court's final argument is that the filing and voluntary departure deadlines are "intertwined" and that a uniform interpretation is therefore "sensible." *Ante*, at 730. Petitioner, for example, was subject to both a deadline to voluntarily depart and a separate deadline to move to reopen his removal proceedings. In reality, however, petitioner only faces penalties for violating one of those deadlines: the 60-day voluntary departure deadline. No one argues here that petitioner was also at risk of missing his deadline to file a motion to reopen. After the BIA issued its order of October 12, petitioner had 90 days to move to reopen the removal proceeding, see 8 U. S. C. § 1229a(c)(7)(C)(i), which meant he had until January 10, 2022. He filed his motion well before that date, so the filing deadline was not implicated in his case. But because he had sought and had been granted the opportunity to leave the country voluntarily, he was required either to comply with the departure deadline or move to reopen before that deadline. See § 1229c(d)(1)(B). By failing to timely depart, petitioner became ineligible for relief from removal, and his motion to reopen was destined to fail on the merits. *Ibid.*

\*    \*    \*

---

[3] The Court contends that the Government implicitly accepted its understanding of the term "days" when it promulgated a regulation reflecting the voluntary departure deadline, see *ante*, at 726–727, but that is simply not true. The regulation incorporating the voluntary departure deadline provides that "[i]n no event can the total period of time [to voluntarily depart], including any extension, exceed . . . 60 days *as set forth in Section 240B of the Act*." 8 CFR § 1240.26(f) (emphasis added). Thus, the regulation pointedly notes that the voluntary departure deadline is governed by the statute, not any regulation.

The provision before us is straightforward. It provides that "[p]ermission to depart voluntarily . . . shall not be valid for a period exceeding 60 days." §1229c(b)(2). Because I see no reason to apply a "specialized" definition of "day," I would take that language for what it's worth. "60 days" means "60 days."

I must therefore respectfully dissent.

JUSTICE BARRETT, with whom JUSTICE KAVANAUGH joins, dissenting.

I agree with JUSTICE THOMAS that the Court is wrong about jurisdiction, but my reasoning is different from his. JUSTICE THOMAS would hold that "a 'final order of removal' refers only to the portion of an [Immigration Judge] or [Board of Immigration Appeals] decision that finds or orders removability, not the entirety of that decision." *Ante*, at 738 (dissenting opinion). Meanwhile, the Court seems to believe that the entirety of an IJ or BIA decision finding removability is the "final order of removal." *Ante*, at 722 (opinion of the Court). In short, JUSTICE THOMAS and the Court disagree about how much of the document issued by an IJ or the BIA is open to challenge: The whole thing? Or just the underlying conclusion that the noncitizen is removable?

I would leave that dispute for another day. In my view, there is no need to debate the scope of the removal order, because no matter how broadly you construe it, Monsalvo does not dispute a single word in it.

The Tenth Circuit had jurisdiction if and only if Monsalvo's petition for review sought "[j]udicial review of a final order of removal" under 8 U. S. C. §1252(a). An "'order of removal'" is an "order 'concluding that the alien is deportable or ordering deportation.'" *Nasrallah* v. *Barr*, 590 U. S. 573, 579 (2020) (quoting §1101(a)(47)(A)). Generally, an order is entered by an IJ and becomes "final" if it is affirmed by the BIA. §1101(a)(47)(B)(i). This Court has held that noncitizens may challenge (1) final orders of removal themselves;

BARRETT, J., dissenting

(2) certain orders brought alongside final orders of removal; and (3) rulings that affect the validity of final orders of removal. See *id.*, at 580–583. These three categories have something in common: Each requires the noncitizen to contest some element of the final order of removal.

Yet Monsalvo did not dispute *anything* in the IJ and BIA decisions finding him removable. He asked the Tenth Circuit to review only the BIA's denial of his motion to reconsider its denial of his motion to reopen his removal proceedings. (As these procedural twists and turns suggest, this case comes to us in an idiosyncratic posture.) In his motion to reconsider, Monsalvo had asked the BIA to revisit only its opinion that he had filed his motion to reopen before the expiration of the voluntary departure period—a view that the BIA had expressed in its denial of Monsalvo's motion to reopen. The decisions finding him removable, however, did not address how to count days under § 1229c(b)(2), much less whether Monsalvo had overstayed his voluntary removal period. So any way you slice it, Monsalvo's petition for review did not seek "[j]udicial review of a final order of removal" under § 1252(a)(1). Proof? Even after Monsalvo's victory in this Court today, every word in the IJ and BIA decisions finding him removable remains legally valid.

I am unpersuaded by the Court's rationale for jurisdiction. The Court attempts to reframe what is really a request for clarification about the meaning of § 1229c(b)(2) as a "challenge" to a notice provision in the original voluntary departure order. *Ante*, at 719–722. But—even assuming that the now-inoperative voluntary departure order has any relevance at this stage—a request for clarification about the order's meaning simply does not speak to the validity of the order itself. See *ante*, at 745–746 (THOMAS, J., dissenting).

The Court's only response is that my reading of § 1252(a)(1) is inconsistent with § 1252(b)(9), also known as the "zipper clause." *Ante*, at 723–724. This argument is puzzling. Section 1252(b)(9) provides that certain forms of judicial re-

Barrett, J., dissenting

view "shall be available only in judicial review of a final order under this section." It therefore underscores that judicial review is available under § 1252(a)(1) only if there is a challenge to a "final order of removal." And here, for the reasons that I have explained, there is no such challenge.

In short, the Court has no answer to the most important question: How can Monsalvo seek judicial review of his final order of removal while conceding that his final order of removal was lawful? He cannot, so the Tenth Circuit lacked jurisdiction.*

\* \* \*

The exact scope of a "final order of removal" has consequences for a host of fact patterns besides the unusual one before us, and because Monsalvo has not challenged any portion of the IJ and BIA decisions finding him removable, I would leave the issue alone. Still, I share Justice Thomas's bottom line: The Court should not have addressed the jurisdictional question at all, and, having forged ahead anyway, it got the answer wrong. I respectfully dissent.

---

*At oral argument, the Government represented that Monsalvo had other avenues for securing a judicial determination whether he had overstayed his voluntary departure period. See Tr. of Oral Arg. 32. Monsalvo could have asked the Department of Homeland Security to return his voluntary departure bond or to adjust his immigration status; if DHS had denied the request, then Monsalvo could have sought judicial review of DHS's denial. *Ibid.*

Page Proof Pending Publication

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 714, last line: "10" is changed to "9"
p. 716, line 13 from bottom: "by" is changed to "in"
p. 716, line 12 from bottom: "Judge" is changed to "Judge's order"
p. 720, line 17: "permitted" is deleted
p. 747, line 8 from bottom: "his" is inserted before "status"